WILLIAM E. CROCKETT (NV Bar No. 182)
wec@weclaw.com
**LAW OFFICES OF WILLIAM E. CROCKETT**
170 South Green Valley Parkway, Suite 300
Henderson, Nevada 89074
Tel: (702) 318-7111
Fax: (702) 318-7101

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| JENNIFER TURNER, an individual residing in the State of Nevada, | Case no. |
| Plaintiff, | |
| v. | **COMPLAINT FOR DAMAGES** |
| APRIL OLSON, an individual residing in the State of Arizona; and ROTHSTEIN, DONATELLI, HUGHES, DAHLSTROM, SCHOENBURG & BIENVENU, LLP, a New Mexico limited liability partnership, | 1. **LIBEL PER SE** <br> 2. **RESPONDEAT SUPERIOR** |
| Defendants. | **JURY TRIAL DEMANDED** |

COMES NOW Plaintiff Jennifer Turner, individually, and complains and alleges as follows:

1. Plaintiff Jennifer Turner ("Turner") brings her complaint under federal diversity jurisdiction, 28 U.S.C. Section 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

2. At all times mentioned herein Turner was a resident of Kingman, Arizona. Turner currently is a resident of Nevada.

3. At all times mentioned herein, April E. Olson ("Olson") was an attorney licensed to practice law in Arizona and a member of Rothstein, Donatelli, Hughes, Dahlstrom,

**EXHIBIT A**

Schoenburg & Bienvenu, LLP, also known as the Rothstein Law Firm, a New Mexico limited liability partnership with offices in New Mexico and Arizona. On information and belief, at all times mentioned herein Olson was a former law school colleague, a former subordinate law associate at Rosette & Associates, as well as a personal friend of Verrin Kewenvoyouma ("Kewenvoyouma").

4. At all times mentioned herein, Defendant Rothstein, Donatelli, Hughes, Dahlstrom, Schoenburg & Bienvenu, LLP ("The Rothstein Law Firm") was a New Mexico limited liability partnership with offices in New Mexico and Arizona.

## GENERAL ALLEGATIONS

5. In and about 2002, Turner began her career in the economic development industry, specializing in working with Native American Tribes. Prior to September 2012, Turner worked with the Saginaw Chippewa Indian Tribe of Michigan and gained a reputation in the economic development industry among various tribes, vendors, etc. catering to that industry as an extremely competent, professional, and honest CEO. The tribal economic development and tourist industry involves various tribes throughout North America and professionals and vendors often are employed and make contacts within a discrete number of tribes engaged in tribal tourism and economic development. As a consequence, a reputation for honesty, particularly in the context of tribes engaged in casino business, is of the utmost importance.

6. In and about September 2012, Turner entered into a contract executed on September 9, 2012, with the Grand Canyon Resort Corporation, an Arizona Corporation ("GCRC") to act as its CEO. This contract was thereafter renewed for the employment term October 1, 2012 and ending September 30, 2015.

7. After Turner was hired, Turner experienced a series of incidents that put her on notice that various GCRC officials and their attorneys suffered from anti-gay bias. One instance of such bias occurred shortly after Turner was hired. Turner was and is a gay; however, unless asked, she kept her sexual orientation to herself in the professional context as it was irrelevant to her duties as CEO.

///

8. One incident occurred when the Board of Directors was attending a retreat at the Fort McDowell Resort in Fountain Hills, Arizona. Derrick Penney ("Penney"), the GCRC Board Chair at the time, invited Turner to golf with him on December 13th at the We-Ko-Pa Golf Club with Kewenvoyouma, the newly appointed GCRC Attorney, and his associates Jason Croxton ("Croxton") and Samantha Greendeer ("Greendeer").

9. As the day progressed, their language became very offensive. The word "fag" was used quite often – as well as the word "dyke." At one point, a female golf ranger asked the group to refrain from driving the golf cart into areas that were restricted. Kewenvoyouma and Penny said all sorts of negative comments about the golf ranger and referred to her as a "fucking dyke," which made Turner very uncomfortable.

10. A second incident occurred around the second week of January 2013. Turner received an anonymous slip of paper under her office door that stated "Be Careful - Wilfred Whatoname is out to get you fired because he thinks you are gay. He is having a background check done on you." Wilfred Whatoname ("Whatoname") is a Tribal Member and a member of the Board of Directors. He was also a past Chairman for Tribal Council.

11. Another incident occurred in June of 2013 when Earlene Havatone ("Havatone"), the General Manager of Hualapai River Running; Ruby Steele ("Steele"), the General Manager of Grand Canyon West; Dawnielle Tehama, the former GCRC Marketing Manager; and Turner were all attending the IPW Trade Show in Las Vegas. Havatone told Steele, Tehama, and Turner a story about how she was staying at a resort with her children. Havatone stated there were gay people hanging out by the pool, while her children were playing in the pool. Havatone said that her children were asking her questions about gay people and that she did not like the display of public affection between gays. Havatone also stated and that she did not like gay people in general and thought being gay was wrong.

12. In and about October 2014 and prior to October 17, 2014, Turner became aware of a board member conducting a personal investigation and collecting data regarding her personal life based upon her sexual orientation. Specifically, on October 10, 2014, Camille Nighthorse ("Nighthorse"), the GCRC Board Chairwoman, and Victor Ingram ("Ingram"), the

GCRC Board Vice-Chairman, asked Turner whether she was engaged to Andrea Collier ("Collier"), CEO of Social Butterfly World and a vendor of GCRC for over five years. In and about October 13, 2014, Ingram advised Turner that he had met with the COO, Laura Ray ("Ray") and Steele in Las Vegas on his own and had discussed Turner's employment, her personal life, and a text message alleging her engagement. He then met privately with Irene Walema ("Walema"), a GCRC Administrative Assistant to discuss Turner's personal life.

13. On October 22, 2014, Turner reported to work and had several employment interviews along with the CFO, Steve Malin ("Malin"), Nancy Eachevarria, and reported with the Board of Directors to a scheduled Tribal Council meeting. At that time, Steele, Havatone, and Jade Honga ("Honga") handed a three-page document to the Tribal Council, which was never produced to the GCRC Board of Directors or Turner. In the executive session, The Tribe questioned Turner about her sexual orientation and her relationship status. After two hours, the Vice-Chairman of the Tribe, Philbert Watahomigie, announced that Turner would be suspended pending a third party investigation and that Malin, the CFO, would be in charge. On October 21, 2014, in violation of GCRC's contract and without explanation, Turner was advised that she was on a "leave of absence." No explanation was given for this extra-contractual action. At that time, Turner was deprived of access to her GCRC email account, to her staff, and to her office, thus rendering it impossible to perform her CEO duties. On October 30, 2014, Toni Fielding, Controller of GCRC circulated a memorandum on behalf of Nighthorse informing staff that Turner was placed on a "Leave of Absence." Thereafter a memo was circulated to employees, vendors, suppliers, etc. announcing that, "Ms. Turner is on leave of absence," giving no explanation for Turner being put on leave of absence. GCRC then formally advised Turner that it was placing her on administrative leave "while several confidential matters are investigated," and noted: "[c]onsidering the scope of the investigation, we do not have a time frame for conclusion; however, we will provide one as soon as it is available."

14. After Turner had been placed on a leave of absence, and on information and belief, Kewenvoyouma contacted his friend Olson and arranged for Olson and her law firm, The

Rothstein Law Firm, to represent GCRC preliminary to the formal termination of Turner. At some point, GCRC retained The Rothstein Law Firm to conduct an independent investigation.

15. Since Turner had contractually agreed to GCRC's termination appeal process conducted by the Human Resources Department, which precluded any additional appeal in Tribal, State or Federal Court, GCRC hired Olson principally to disparage Turner's reputation among the vendors and other members of the Native American economic development and tourism Industry. Prior to December 5, 2014, Olson made a request to "interview" Turner. In response, Turner's counsel queried Olson as to the subject of the "interview". On December 5, 2014, Olson sent a letter to Turner's counsel in which she advised that the request to interview Turner, "makes no inference of wrongdoing by Ms. Turner and the request to interview her does not suggest any wrongdoing has occurred." Nonetheless, Olson refused to elaborate on exactly what she proposed to interview Turner about, leaving the impression that any such open-ended interview would include questions about Turner's sexual orientation along the lines that the Tribal Council had previously engaged in.

16. In and about November 21, 2014, Olson sent letters to F. Christopher Austin, attorney for Social Butterfly World; Andrea Collier, the CEO of Social Butterfly World; Bessy Lee, a former employee of Chinese Host Destinations; and David Huang, the owner of Chinese Host Destinations. Social Butterfly World is an established marketing and advertising vendor of GCRC's and located in Las Vegas, Nevada. Chinese Host Destinations is one of the largest tour companies GCRC is contracted with out of Las Vegas, Nevada, to bring tourists to GCRC's largest business enterprise - Grand Canyon West. A letter was also sent to Dawnielle Tehama, the former GCRC Marketing Manager, and on information and belief other vendors doing business in the tribal tourism and economic development as well. The letters provided in part that the purpose of the contact was to "conduct an independent investigation into recent events relating to Jennifer Turner, GCRC employees and GCRC vendors." The letter specifically identified Turner as the principal target of this "investigation" and consequently put a terrible cloud on Turner's reputation for honesty by specifically mentioning Turner as by creating the inference that Turner was being investigated for dishonesty in connection with her duties at

GCRC. When these letters were sent, Olson knew that GCRC had previously sent a letter advising vendors had already been advised that Turner had been "put on leave" without explanation. By singling out Turner as the subject of an undefined "investigation" Olson, acting in her capacity as an attorney at and an employee of The Rothstein Law Firm, knowingly created the implication that Turner was guilty of malfeasance, which was Olson's intent when disseminating this letter.

17. The recipients of this letter were principally vendors doing business in Las Vegas and in the Native American economic development and tribal tourism business in Nevada. Although Olson's letters emanated from her office in Arizona, her client GCRC and the majority of recipients were engaged in marketing to clientele visiting Las Vegas and taking side trips to the GCRC's Grand Canyon West operations.

18. When Olson sent these letters, she was aware that GCRC barred Turner from communicating to vendors and consequently she knew that there would be an additional negative impact of her letters since Turner would be unable to explain to the vendors that she was not guilty of wrongdoing. In sum, by sending these letters Olson purposely engaged in an effort to ruin Turner's professional reputation among members of the tourism industry that would have a profoundly negative impact on Turner's ability to obtain future employment and conduct business in the tribal economic and tribal tourism business in Nevada, Arizona, and elsewhere.

19. In and about December 2014 through January 22, 2015, Olson conducted interviews with prior and current employees of GCRC and others. During this time frame, Turner's attorneys repeatedly request that Olson provide an explanation as to the purpose of this "investigation" which Olson refused to do. On information and belief, the principal purpose of these interviews was to investigate Turner's personal life and sexual orientation, and to harass Turner because of her sexual orientation. Because Olson refused to explain what she was investigating, and because Turner had already subjected herself to the Tribal inquiry about her sexual orientation and personal life, Turner did not submit to an interview.

20. On January 23, 2015, Nighthorse terminated Turner based upon Turner's purported failure to "participate and respond in a timely manner to inquiries as part of the

investigation." This letter failed to define the subject matter of the investigation or explain how, in view of GCRC's prior admonition that she was not permitted in or on GCRC's offices or to contact employees or agents, she would be in a position to perform her duties.

## FIRST CAUSE OF ACTION

### (Libel Per Se – OLSON)

21. Turner incorporates by reference paragraphs 1 through 20 as though fully set forth at length herein.

22. The letters referenced herein created the false impression that Turner had been engaged in dishonest conduct in the performance of her duties as the CEO of GCRC. The subject letters were sent after Turner had been abruptly and without explanation put on leave of absence by GCRC, and barred from accessing her emails and communicating with fellow employees and vendors. When Olson sent these letters on behalf of The Rothstein Law Firm, she understood that the third party vendors receiving her letters would construe them as disparaging Turner's character and honesty which were of particular importance to those engaged in casino-related tourism. Additionally, Olson understood that the vendors receiving her letters would construe them to be specifically related to Turner's honesty both because she had been put on unexplained leave and because they mentioned her specifically and did not mention any other GCRC employee.

23. Olson also knew that in communicating to vendors in the Native American economic development and tourism industry, Turner's reputation throughout this industry would be materially harmed, since vendors in the Native American economic development and tourism Industry regularly attend tradeshows and conventions at which time the "investigation" of Turner would inevitably be discussed and construed as implicating that Turner had been guilty of malfeasance.

24. When Olson sent the letters to third party vendors, she had no information supporting any malfeasance on the part of Turner and communicated that fact to Turner. Nonetheless, she purposefully wrote the letters calling Turner out by name and by failing to

either explain the reason or subject of the "investigation" so as to create the worst possible implication by the receiving vendors, i.e. that Turner had done something wrong.

25. As a direct consequence of Olson's actions, Turner's reputation in the Native American economic development and tourism Industry has been substantially damaged. Turner has spent most of her professional life in this industry and her ability to find employment in this industry has been harmed in that Olson's letter effectively widely published and create inferences of malfeasance by Turner to a large audience of vendors who would otherwise not have any knowledge of GCRC's actions. Any such inferences were false in that Turner's performance of her CEO duties at GCRC were at all times honest, above board and professional.

## SECOND CAUSE OF ACTION

### (Respondeat Superior – THE ROTHSTEIN LAW FIRM)

26. Plaintiff hereby incorporates by reference all prior paragraphs as though fully set forth at length herein with the same force and effect.

27. Sending letters of the type referenced herein is an act that Defendant Olson was and is employed and authorized to perform as an attorney at The Rothstein Law Firm.

28. When Olson sent the letters referenced herein, she acted within the authorized time and space limit of her authority as an attorney at The Rothstein Law Firm, and was motivated to send the letters in order to serve her employer, The Rothstein Law Firm, attorneys for GCRC.

29. While engaging in the above-described tortious conduct, Defendant Olson was within the scope and course of her employment with the named Defendant The Rothstein Law Firm. Therefore, Defendant The Rothstein Law Firm is responsible for damages caused by said conduct of Olson under the principle of Respondeat Superior.

30. As a direct consequence of Olson's actions taken in furtherance of The Rothstein Law Firm's representation of GCRC, Turner's reputation in the Native American economic development and tourism Industry has been substantially damaged, as described in detail herein above.

///

# PRAYER

WHEREFORE, Turner prays for judgment against Defendants as follows:

### FIRST CAUSE OF ACTION

### (Libel Per Se – OLSON)

1. For compensatory damages in an amount in excess of $75,000;
2. For punitive damages in an amount in excess of $75,000;
3. For pre-judgment and post-judgment interest on all amounts awarded herein;
4. For costs of suit herein incurred;
5. For such other relief as the Court may deem just and proper.

### SECOND CAUSE OF ACTION

### (Respondeat Superior – THE ROTHSTEIN LAW FIRM)

1. For compensatory damages in an amount in excess of $75,000;
2. For pre-judgment and post-judgment interest on all amounts awarded herein;
3. For costs of suit herein incurred;
4. For such other relief as the Court may deem just and proper.

DATE: June 19, 2015     LAW OFFICES OF WILLIAM E. CROCKETT

By: ___/s/ William E. Crockett_____
     WILLIAM E. CROCKETT

Attorneys for Plaintiffs